UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-12154-RGS

STEVEN ETHIER

v.

THRIVE OPERATIONS, LLC

MEMORANDUM AND ORDER
ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

May 14, 2020

STEARNS, D.J.

Thrive Operations, LLC (Thrive), terminated Steven Ethier from his at-will position as a Managed Service Provider (MSP) manager in June of 2017, citing performance and behavioral problems. Alleging that his firing was motivated by age discrimination (he was 52 years old), Ethier sued Thrive on August 3, 2018.

Thrive removed the suit to this court and now, discovery having been completed, Thrive files for summary judgment contending that Ethier cannot satisfy the "adequate performance" and "replaced by another" prongs of the *McDonnell Douglas*[1] burden-shifting paradigm. Ethier counters that Thrive's hiring and promotion practices, and negative comments by Thrive

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).

managers about his age, evidence a discriminatory animus that precludes summary judgment.   The court heard oral argument by way of a videoconference on April 30, 2020.

## BACKGROUND

Thrive is a managed information technology (IT) services provider with some 120 employees, ninety of whom are engineers.  Pl.'s Ex. 2 (Dkt #26-1) at 7.  Thrive provides IT support to approximately 400 clients – "small, midsize, and enterprise businesses, with some public as well." Levesque Dep. (Dkt #18-1, Ex. A) at 9.  Thrive is the outgrowth of a merger in late 2016 between two independent companies, Corporate IT Solutions (CITS) and Thrive Network.  CITS employed Ethier in July of 2014 (he was 49 when hired) as a Professional Service Manager (PSM).  Ethier reported to Jeffrey Boardman, Thrive's chief technology officer.[2]  Ethier's job was to manage senior engineers performing large-scale IT projects for clients. Boardman Dep. (Dkt #18-1, Ex. G) at 16.  Boardman testified that Ethier

---

[2] When hired at CITS, Ethier read and signed the Employee Handbook, acknowledging that he understood that his employment was "at will," and that any discipline for violations of Thrive's "standards of conduct . . . will be determined by the company."  Def.'s Statement of Undisputed Facts (SOF) (Dkt #18) ¶ 12.

performed well in his position at CITS and consistently received 100% of his quarterly bonuses.  *Id.* at 8; Def.'s SOF ¶ 18.

Ethier complains that Thrive is infected by a "youth culture."[3]  During his first year at CITS, Ethier states that his manager, Gene Garceau, and another manager, Karen Pentacost, both of whom were over 50, were terminated.  He also asserts that, after the merger and until his termination, Robert Levesque, vice president of technical service delivery, promoted several substantially younger employees (Brendan White, Justin Scheri, Jim Bayliss, Dennis Stolyarov and Troy Wentworth) to management positions.  Ethier Dep. (Dkt #18-1, Ex. C) at 107-108.  Ethier states that Wentworth, who is in his late 20s, was selected over a more experienced employee Duane Kostas (Ethier's candidate), who was in his 50's.  Ethier alleges that Kostas withdrew his application when it became clear that he would not be considered.[4]

---

[3] Thrive states that, "[a]s a technical company with largely entry-level jobs, Thrive might be expected to have a small distribution of over-40 workers, however, 28% of new hires since 2014 are over 40 and 45% are in their late-30s or older."  Def.'s SOF ¶¶ 2-5.

[4] Kostas agrees that he "was leaning towards heading into a management position and Mr. Ethier was trying to help guide [him] to it." Kostas Dep. (Dkt #18-1, Ex. H) at 12.  However, Kostas withdrew when "it didn't go well and [he] backed out of getting the position."  *Id.*  Kostas agreed

Ethier's PSM position was eliminated prior to the merger[5] and he was reassigned "in early 2016" to the role of a MSP managing entry level engineers (as opposed to the experienced engineers that he oversaw at CITS). Def.'s SOF ¶ 19; Ethier Dep. at 39.  The position also differed in that Ethier was "required . . . to 'establish support team metrics for productivity, capacity, and client satisfaction [and to] promote team building.'"[6]  Def.'s SOF ¶ 21.  Initially, Ethier reported to Bill Burke, who was 37 years old (14 years Ethier's junior), and from January of 2017 until his termination to Levesque.[7]

---

that age played no role in Thrive's decision to award another employee the position.  *Id.*

[5] Ethier began as an MSP manager in January of 2016, prior to the merger.  Ethier Dep. at 38.  Ethier claims that he was "never informed that the Professional Service Manager position was eliminated due to financial problems."  Pl.'s Statement of Disputed Facts (SODF) (Dkt #26) ¶ 19.  Rather, he believes that for purposes of efficiency his duties were absorbed by Bill Burke and he was "promoted" to take the MSP position which "was vacant" after the prior job occupant, Kumar Khatri (60+ years old) was terminated.  *Id.*  To the extent that it has any material bearing, Thrive does not contest Ethier's performance as a PSM.  Def.'s SOF ¶ 18.

[6] Ethier testified that he was unfamiliar with the "tool" Thrive had him use to create the metrics.  Ethier Dep. at 40-41.

[7] Levesque testified that Ethier's MSP job duties were "to oversee level one support ['help desk support'], our field services support ['field services staff are dispatched to client locations either on a prescheduled basis or a

4

Thrive maintains that in this changed role, Ethier's performance was not acceptable and, from approximately August of 2016 forward, Ethier displayed inappropriate interpersonal behaviors that resulted in two employee complaints. The first was reported to Human Resources (HR) on August 31, 2016, by Jamila Smoot, a co-worker, for "defaming [her] character and making negative comments as far as [her] work in front of a coworker/new hire." Def.'s SOF ¶ 24. In her email to Jennifer Donegan, Thrive's Comptroller and HR officer, Smoot complained that while introducing a new hire to the office, Ethier curtly told her that he needed "the new hire paperwork done and she needs a [security] fob." Def.'s Resp. to Req. for Doc. (Dkt #18-1, Ex. D) at 78. When Smoot replied that she would "see what I can do," Ethier "stated in a rude tone I want it done by the end of the day." *Id.* Then, when showing the new hire the office kitchen, Ethier told her that, "I have a stash of paper towels if you need any. Jamilla [Smoot] needs to step it up and do a better job." *Id.* When asked about the incident at his deposition, Ethier testified that he knew that Smoot was in earshot but that Smoot "took the comments the wrong way that were made in jest." Ethier Dep. at 19.

---

reactive basis'], and [Thrive's] after-hours support [from 6 p.m. to 8 a.m.]." Levesque Dep. at 7-8.

According to Thrive, the second behavioral issue arose when, in the company of a co-worker (Duane), Ethier asked another employee, Devin Jolliffe, whether he continued to be "contagious."[8]   Jolliffe reported the remark to HR as a HIPPA violation.[9]

After Smoot's complaint in August of 2016, Donegan relayed her concerns about Ethier's behavior to Michael Cook, the pre-merger president of the corporate IT department, and William Burke, the Chief Information Officer and Ethier's direct supervisor from January of 2016 until January of 2017.  Donegan reported, "I do not know what is going on with Steve the past few months, but this is unacceptable.  He continues to be rude to employees and managers.  He makes unnecessary comments and has been acting with

---

[8] Ethier testified that his question to Jolliffe (who had been out sick with shingles) was, "Devin what are you doing here? Aren't you still contagious?"  Ethier Dep. at 67-69.

[9] Ethier testified that

> Devin was upset because I was tracking his attendance because . . . Devin's attendance was horrible and he was overusing sick time and all his PTO.  Bill Burke asked me to track him closely, so I was. . . . Devin took it as I was harassing him.  And when this alleged HIPAA violation came up, he decided to use that in his favor.  And if I'm not mistaken, he was terminated shortly after me and I think his termination was based on attendance, oddly enough.

Ethier Dep. at 69.

little or no professionalism.  I would like this address[ed] with him."  Def.'s
SOF ¶ 29; Def.'s Ex. D at 78.  Burke testified, without specifying names, that
the junior engineers chafed under Ethier's supervision.  Citing Ethier's
"ongoing behavioral problems," Burke slashed Ethier's third quarter 2016
bonus of $2,500 to $1,250.[10]  Ethier responded with a series of "combustible
emails" complaining about the reduction, Burke Dep. at 15-16, to which
Burke responded that Ethier "needed to be nicer."  Ethier Int. Ans. (10(c))
(Dkt #18-1, Ex. E) at 98.

Boardman testified that Ethier's performance deteriorated when he
was assigned to manage lower level engineers, "a very different kind of role"
than the one he had performed previously – and that "within a couple of
months we started to receive complaints from the engineers . . . which grew
over time."  Boardman Dep. at 10, 19.  Boardman stated that, "as lead
engineer in the company . . . the engineers would come to [him] . . . to talk
about anything."  *Id.* at 19.  Boardman, who had been responsible for Ethier's
promotion, initially "was pushing back to managers [to] give him a chance
. . . [in his] new role."  *Id.*  But as Ethier had "more temper flareups . . . and

---

[10] Burke testified that Ethier's quarterly bonus structure was part of his employment offer letter and followed him after "the change of regime." Burke Dep. (Dkt #18-1, Ex. B) at 10.

run-ins with engineers," Boardman came to believe that Ethier had "los[t] control of the group as a whole [and] it's really hard to come back from that." *Id.* Boardman testified that he had witnesses Ethier

> get frustrated with an employee and go in his office and slam the door and not come out for the rest of the day.  Or he would yell at an employee.  And I don't want to say scream, but definitely an inappropriate level of tone.  Because we had a big wide open room . . . to discipline, the standard was you bring them into your office and have a private conversation.  [Ethier] would tend to discipline in the cube farm area, which is just not appropriate.

*Id.* at 21.

Burke's role at Thrive was to ensure that staff are in the "right positions to be successful, the culture, people being professional, respectful, HR type stuff."  Burke Dep. at 33.  Burke testified that by the end of 2016, Ethier "was failing" and Burke "had enough of [Ethier's] pushback . . .  [and] was "ready to walk [him] to the door."  *Id.* at 17, 32.  Burke added that, however, "we don't take decisions like that lightly.  So I said, 'Bob [Levesque], why don't you manage him and see what you think.'"  *Id.* at 17.   In January of 2017, Levesque became Ethier's manager.

Part of Ethier's role as an MSP was to create metrics to measure the performance of the groups that he managed.[11]  Levesque testified that the

---

[11] For example, on February 1, 2017, Levesque sent Ethier an email setting out the goals for "24x7 support."  Def.'s Resp. to Req. for Doc. at 151.

metrics were required to make "[i]mprovements to Thrive's technical operations and work flows in an effort to improve [its] consistency and efficiency." Levesque Dep. at 28. When Ethier failed to establish key performance indicators (KPIs) for his staff, Levesque testified that he undertook to "coach Ethier . . . and make himself available." *Id.* at 35

In March of 2017, Levesque reduced Ethier's quarterly bonus by 50% based on "continuing delays and missing key deliverables, specifically the delays in defining and establishing metrics for field services capacity and the after-hours team. Two of the three teams you oversee." Def.'s Resp. to Req. for Doc. at 141. In a warning email to Ethier, Levesque wrote – "This is something we have[d] discussed multiple times and should come as no surprise at all. Each time I request an update in each of your semi-weekly 1-1s, you have acknowledged the lack of progress each time and this is now a consistent problem." *Id.* Levesque and Burke eventually decided that Ethier "wasn't the fit for the organization as it was poised to grow over the coming months and years." In terminating Ethier, they also decided to "eliminate his position."[12] Def.'s SOF ¶¶ 80-82, 96-100, and 126-128.

---

[12] Levesque testified that employee complaints played no role in his decision that Ethier "was no longer the appropriate person for that position." Levesque Dep. at 36. "Not from an attitude perspective, but from an ability to grasp concepts specific to ITIL, which is the [IT] service framework that

On April 26, 2017, Levesque sent an email announcing that Brendan White ("late 20s") would assume the management of field services – previously a component of Ethier's job.[13]  *See* Def.'s Resp. to Req. for Doc. at 160.  Levesque testified that "Ethier was struggling to take charge of that group from a capacity management and scheduling perspective and the decision was made to alleviate him of that responsibility so he could focus on level-one and after-hours support."  Levesque Dep. at 11.  After Ethier was terminated, after-hours support shifted to Levesque, while the management of level-one support was assigned to Wentworth ("late twenties").  *Id.* at 14-15.  Levesque testified that management no longer felt "the need to replace the position directly, it could be absorbed throughout the team."  Levesque Dep. at 40-41.  "We identified that we needed a more technical supervisor to assist the team on development plans, someone that better understood the technical needs of our clients and the technology that we were contracted to support."  *Id.* at 41.

---

we were using . . . [Ethier] had trouble grasping those concepts."  *Id.* at 39-40.  "My perspective was strictly performance based, based on goals that I gave him and the vision that I needed him to adopt to effectively scale that department."  *Id.* at 36.

[13] Ethier stated that, as a MSP, he was given too many employees to oversee.  Ethier Dep. at 61 ("I was managing 28 people which is far too many for one person to manage.").

Ethier claims that, prior to his termination, he had never "received any warnings" nor had he been "provided with any performance improvement plans or any type of corrective action concerning his performance." Am. Compl. (Dkt #1, Ex. 3) ¶ 15. Ethier agrees that there were "a number of emails where it was apparent that Levesque was dissatisfied with his performance on metric creation, but the emails did not "say that your job is on the line." Ethier Dep. at 178. Ethier testified that he was shocked when he was fired as he was "performing his job well . . . and was improving creating metrics." Pl.'s SODF ¶ 89.

> The Employee Handbook, Standards of Conduct #4, reads as follows:
>
> *If an individual's behavior interferes with the orderly and efficient operation of a department, corrective disciplinary measures will be taken.*
>
> *Disciplinary action may include a verbal warning, a written warning, suspension with or without pay and /or discharge. The appropriate disciplinary action imposed will be determined by the company. The company does not guarantee that one form of action will necessarily precede another.*

Def.'s Resp. to Req. for Doc. at 131. Ethier testified that CITS's practice was to "give people coaching, performance improvement plans, warnings, verbal, and then written. Go through a process of all that before even thinking about terminating someone. . . . They had a specific form for PIPS, performance improvement plans." Ethier Dep. at 46.

Ethier testified that as the "oldest guy in the room," he was often ("one to two dozen times over the three year period") the target of statements by "leadership members like Bill Burke, Jeff Boardman, Kevin Randall, even Mike Cook," about his age ("Oh, let's ask the old guy, he'll know." "Here comes the gray hair."). *Id.* at 81.  Because they were his supervisors, Ethier stated that he would "just kind of laugh it off."  Def.'s Resp. to Req. for Doc. at 128.  "Otherwise I'm stirring the pot."  Ethier Dep. at 82.  Ethier also testified that, despite the banter about his age, the environment at Thrive was never "hostile."  *Id.* at 85.  However, after his termination, "he reflected on the comments . . . and felt that they did have an issue with his age."  Pl.'s SODF ¶ 134.

The Employee Handbook also addressed employees' responsibilities regarding violations of its harassment and discrimination policy.

> *If you have any concern that our no harassment policy may have been violated by anyone, you must immediately report the matter.   Due to the very serious nature of harassment, discrimination, and retaliation, you must report your concerns to one of the individuals listed below.*

Def.'s Resp. to Req. for Doc. at 128. The Handbook specified that, "[a]t a minimum, the term 'harassment' as used in this policy includes: Offensive remarks, comments, jokes, slurs or verbal conduct pertaining to an individual's . . . age . . . ."  *Id.* at 124.  Ethier concedes that, despite the

mandatory reporting requirement, he never complained about any of these offensive remarks.  Ethier Dep. at 51.

Ethier claims that, following his termination, Thrive replaced him with younger employees.  He filed a timely age discrimination claim with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC).  After receiving a Right to Sue Notice from the EEOC on May 22, 2018, Ethier filed a Complaint in the Norfolk Superior Court against Thrive alleging violation of the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B, and the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.  Thrive counterclaimed for breach of contract and removed the case to the federal district court.[14]

 In his Amended Complaint, Ethier

> bases his opinion that he was discriminated against on the basis of his age on the following facts: (1) comments made by the leadership team about his age during his tenure at CITS and [Thrive]; (2) two engineers in their 30s being promoted to the classification of manager just before the merger; (3) when [Ethier] made it clear for his desire to hire a supervisor internally, who would work under [him] and who was in his 50s, and who had basically been promised the position prior to the merger by [Ethier's] boss, William Burke, he was then rejected in

---

[14] At the time of his termination, Ethier executed a waiver of any claims that he may have had against Thrive in return for a month of severance pay and benefits.  *See* Def.'s Resp. to Req. for Doc. at 138-140.  The agreement was later found voidable as lacking statutorily required language.

favor of a 28 year old person; (4) [Ethier] could see a youth movement at [Thrive] as most, if not all, new employees hired or promoted were in their 20s, 30s, or early 40s; and (5) the person who terminated [Ethier] and told him that it was for poor performance, William Burke, was in his late 30s and he had been hiring and promoting employees in their 20s and 30s.

Am. Compl. ¶ 22; *see also* Pl.'s Ex. 3 (Charge of Discrimination) ¶ 10.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). In assessing the genuineness of a material dispute, the facts are to be "viewed in the light most flattering to the party opposing the motion." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).

Ethier alleges discrimination under both state and federal law – Chapter 151B and the ADEA.[15] "The ADEA makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Vélez v. Thermo King de P. R., Inc.*, 585 F.3d 441, 447 (1st Cir. 2009), quoting 29 U.S.C. § 623(a)(1). The United States Supreme Court has made clear that under the ADEA, a plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176 (2009).

In cases that rely on indirect evidence of discrimination, as with Ethier's, the court follows the familiar three-stage paradigm set out in *McDonnell Douglas. See Vélez,* 585 F.3d at 447 n.2; s*ee also Zabala-de Jesus v. Sanofi-Aventis Puerto Rico, Inc.,* No. 18-1852, 2020 WL 2465071, at *4 (1st Cir. May 13, 2020). Under the framework, Ethier can make out a prima facie case by showing that:

> (i) [he] was at least 40; (ii) [his] work was sufficient to meet the employer's legitimate expectations; (iii) [his] employer took adverse action against [him]; and (iv) either younger persons

---

[15] In construing the Commonwealth's employment discrimination statute, Massachusetts courts look to federal law for guidance. *See Tate v. Dep't of Mental Health*, 419 Mass. 356, 361 (1995); *Cox v. New Eng. Tel. & Tel. Co.,* 414 Mass. 375, 382 (1993).

> were retained in the same position upon [his] termination or the employer did not treat age neutrally in taking the adverse action.
>
> To rebut the presumption of discrimination generated by a prima facie case, the defendants must then "articulate a legitimate, nondiscriminatory reason for dismissing the employee." If the defendants successfully do so, "the presumption vanishes and the burden shifts once again." At that point, [plaintiff] must point to evidence sufficient to show that the defendants' given reason was pretextual and that age was the true cause of his termination.

*Santana-Vargas v. Banco Santander P.R.*, 948 F.3d 57, 60 (1st Cir. 2020); *see also Blare v. Husky Injection Molding Sys., Inc.,* 419 Mass. 437, 441 (1995) ("To establish a prima facie case under G.L. c. 151(B), a plaintiff must show (1) that he was over forty years of age; (2) that he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill his position by hiring a younger person with similar qualifications."). The replacement worker must be "substantially" younger than the plaintiff. *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311-312 (2003). "Substantial" means a five year or greater difference in age. *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 424 (2003); *see also Massasoit Indus. Corp. v. MCAD*, 91 Mass. App. Ct. 208, 211 (2017).

Examining this evidence in the light most favorable to Ethier, and recognizing that the burden on a plaintiff is "not particularly onerous," the court, for purposes of this motion, will assume that Ethier has made a prima facie showing of discrimination. *Meléndez v. Autogermana, Inc.*, 622 F.3d

46, 51 (1st Cir. 2010). At the prima facie phase of the burden-shifting analysis, a plaintiff is not required to disprove the employer's proffered reasons for his termination. *Acevedo-Parrilla v. Novartis Ex-Laz, Inc.*, 696 F.3d 128, 139 (1st Cir. 2012). An ADEA plaintiff also is not required to establish, as an element of his prima facie case, that he was replaced by an individual younger than himself, or by someone outside of the protected class. *See O'Connor*, 517 U.S. at 312; *see also Sanchez v. P.R. Oil Co.*, 37 F.3d 712, n.7 (1st Cir. 1994). That said,

> [a] discharged employee "is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." Rather a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."

*LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 846 (1st Cir. 1993), quoting *Barnes v. GenCorp., Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990).

A prima facie case in place, the burden shifts to Thrive to offer a non-discriminatory reason(s) for Ethier's termination. Thrive offers two such reasons – one personal to Ethier and the other personal to Thrive – performance problems and a post-merger reorganization. Both are sufficient

to satisfy Thrive's nonjudgmental burden of production at the second stage of the *McDonnell Douglas* burden shifting.[16]

At the third stage of the analysis, Ethier must come forward with evidence of either pretext or discriminatory animus. *See Zabala-de Jesus*, 2020 WL 2465071, at *4 ("If the defendant puts forth such a reason, then, at the third step of the [ADEA] inquiry, the burden of production shifts 'back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory,' for, otherwise, the defendant is entitled to summary judgment."); *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007), quoting *Dávila v. Corporación De Puerto Rico Para La Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007) ("At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age."). In this regard, Ethier relies mostly on negative comments about his age which he attributes (in some instances) to his supervisors. Ethier admits that, at

---

[16] Ethier complains that Thrive did not raise reorganization as a defense in its filings with the EEOC. However, a defendant, unlike a plaintiff in bringing a discrimination charge, is not bound by the scope of its response to the charge.

the time, he perceived these remarks as mere banter and often responded in kind.  Nor did he consider isolated comments about him being the "old guy" as harassing or discriminatory.  It was only after his termination that he came to "realize" their import.  Accepting, as I must, that the comments were made, they do not show the degree of animus that would permit a reasonable jury to resolve the issue in Ethier's favor.  *See Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 49 n.24 (2005) (finding that a supervisor's comment that "[y]ou are part of the old guard[,] [y]ou have never adapted to the new system at Liberty Mutual, [and] [y]ou simply do not fit in around here anymore," did not constitute direct evidence that a layoff was motivated by unlawful age discrimination).  Isolated or ambiguous remarks, offered as indirect evidence tending to suggest animus based on age, are in and of themselves insufficient to prove discriminatory intent.  *See Speen v. Crown Clothing Corp.*, 102 F.3d 625, 637 (1st Cir. 1996) (company president's alleged comment, "Why do I need a 71–year-old when I can have a 51–year-old?" deemed insufficient to show that salesman's termination constituted age discrimination or that employer's proffered reason was pretextual); *Fontaine v. Ebtec Corp.*, 415 Mass. 309, 314 n.7 (1993) ("[I]solated or ambiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, prove an employer's discriminatory intent.").

19

While Ethier complains that a high proportion of the employees that Thrive hired after the merger were under 40, while a higher proportion of those fired were over 40, he has offered no evidence regarding the pool of applicants or the composition of the relevant labor market. Statistics, when considered in isolation, are not probative of age discrimination. *See Acevedo-Parrilla*, 696 F.3d at 145-146 ("[O]ur case law makes clear that [plaintiff] should have introduced evidence regarding the relevant labor market in order to put [Thrive's] hiring data into context); *see also LeBlanc*, 6 F.3d at 848 ("[T]he fact that recently hired [employees] are younger than [the plaintiff] is not necessarily evidence of discriminatory intent, but may simply reflect a younger available work force."). Accordingly, the court will turn to Ethier's alleged performance issues.

Putting aside Smoot and Devin's complaints to HR, there is ample unrebutted evidence that Ethier's skillset in overseeing senior engineers did not transfer to his job supervising junior engineers. Nor did it equip him to develop metrics to measure their performance. As Levesque testified, Ethier's fatal failings did not stem "from an attitude perspective, but from an [in]ability to grasp concepts specific to ITIL, which is the [IT] service framework that we were using . . . [Ethier] had trouble grasping those concepts." Levesque Dep. at 39-40. "My perspective was strictly performance

based, based on goals that I gave him and the vision that I needed him to adopt to effectively scale that department.  *Id.* at 36.  Boardman, who had recommended Ethier for promotion and who had urged other managers to give him a chance to transition, testified that Ethier appeared to lack insight into managing entry-level engineers and, as he became more impatient, lost his ability to direct them.

Whether this change in Ethier's performance is attributable to a lack of the skills needed in his new position, or to Thrive's unreasonable expectations as to his performance, or to Thrive's failure to provide proper training or warnings, is of no matter.  As the First Circuit has repeatedly cautioned, where an employer exercises its business judgment for a nondiscriminatory reason in terminating an older employee, it is of no legal significance that its business judgment may seem objectively wrong-headed or unwise.  *Woodward v. Emulex Corp.,* 714 F.3d 632, 639 (1st Cir. 2013) ("We are not concerned with whether the stated purpose 'is unwise or unreasonable.'  Instead, [a plaintiff] must show that the stated purpose is untruthful."), quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993); *see also Webber v. Int'l Paper Co.*, 417 F.3d 229, 238 (1st Cir. 2005) ("[A]n employer is free to terminate an employee for any nondiscriminatory reason, even if its business judgment seems objectively

21

unwise."). It was Ethier's burden, at a minimum, to show that Thrive's stated purpose for terminating him was "untruthful" pretext intended to conceal a discriminatory animus. This he has not done.

ORDER

For the foregoing reasons, Thrive's motion for summary judgment is ALLOWED. The Clerk will enter judgment for Thrive and close the case.

SO ORDERED.

/s/ Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE